UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    10-CR-435(AKH)

     -against-

MARILYN JOHN,

          Defendant.

------------------------------x


### SENTENCING MEMORANDUM


DAVID L. LEWIS, ESQUIRE
LEWIS & FIORE, ESQS.
Attorney for Defendant
MARILYN JOHN
225 Broadway, Suite 3300
New York, New York 10007
(212) 285-2290

**LEWIS & FIORE**
**225 BROADWAY, SUITE 3300**
**NEW YORK, NEW YORK 10007**
**(212) 285-2290**
**(212) 964-4506 (FAX)**

**David L. Lewis**
**Charles G. Fiore**

February 16, 2012

**FILED ECF**

Honorable Alvin K. Hellerstein
United States District Judge
United States District Court
500 Pearl Street
New York, New York 10007

RE:   **United States of America v.**
**Marilyn John**
**10-cr-435(AKH)**

Dear Judge Hellerstein:

I write with regard to the difficult and complex task of sentencing of Marilyn John, now scheduled before Your Honor on February 24, 2012.

Ms. John stands convicted upon her plea of guilty to a two count Information on July 19, 2010. The first count of the Information charged her with embezzling federal funds through a non-profit entity, Caribbean Woman's Health Association, where she was employed as the Executive Director, in violation of Title 18 U.S.C. § 666. The second count of the Information charged her with conspiracy to commit wire and bank fraud in violation of Title 18 U.S.C. § 1349 by being a straw buyer in a mortgage fraud conspiracy, which involved signing blank documents for the purchase of three properties in exchange for nominal payments in the expectation that the properties would be quickly resold or flipped.. The plea of guilty was pursuant to an agreement with the government which included her cooperation.

Immediately upon her arrest in November of 2009, Ms. John agreed to assist the Government in its investigation. She attended multiple meetings with the government attorneys and

Honorable Alvin K. Hellerstein
February 16, 2012
Page 2 of 52

agents. In these meetings she fully described her criminal
activities. She also provided information valuable to the
government concerning her accomplices in the mortgage fraud.
The assistance she provided resulted in the convictions of two
of the ringleaders of mortgage fraud scheme, as well as one of
the lesser members of the conspiracy.

Significantly, she voluntarily admitted to additional
criminal conduct unknown to the government. As a result of her
own admissions, she was charged and pleaded guilty to
embezzlement of federal funds through the non-profit entity for
which she was employed.

The government concluded and addressed a letter to the
Court that characterized her cooperation as "substantial" and
important. It enabled the government to hold to account the
people most responsible for carrying out a 9 million mortgage
fraud scheme, despite her personal risk and fear. Her
information was truthful, complete and reliable.

**THE CRIMES**

Ms. John was the Executive Director of the Caribbean
Woman's Health Association which is a non-profit entity that
receives federal monies. It provides services to low income
woman and immigrants with respect to HIV/AIDs prevention,
maternal health, child health care and immigration issues.
During her tenure, Ms. John misappropriated approximately
$60,000 through various methods. First, she gave herself salary
increases without approval of the Board of Directors. She also
used grant funds for her own purposes by writing into the grants
additional salaries for herself to which she was not entitled.
While it is often part of the job of the Executive Director in
small organizations to write grants which include amounts
attributable to their own salaries, it does not entitle them to
remove monies when such grants are awarded. She also obtained
consulting fees that were unauthorized from grant monies.
Finally, she made certain payments to herself which she was not
authorized to make. She did not forge any signatures.

With regard to the mortgage fraud scheme in March of
2006, Ms. John applied for mortgages on properties. She signed
a series of documents in blank knowing that they were to be used
for the purpose of having her be a straw buyer. Her stated

Honorable Alvin K. Hellerstein
February 16, 2012
Page 3 of 52

expectation as she said to the Court at the time of her plea was
that the properties would quickly be "flipped" or resold.   The
documents, filled in by others, contained false information
concerning personal income and liabilities, employment, and
residency/occupancy.   Ms. John was indifferent to the truth of
what would be put on the document, believing that she was merely
loaning her credit to other people for a short interval.   As
part of the application, Ms. John claimed in each of three
instances that the property would be her primary residence.   Not
one of them was in fact or was to be her primary residence.
While the entire fraud obtained loan proceeds in the amount of
$2,589,000, the Government could not at the time of the plea
inform the Court of the amount lost on the loans because some of
the properties were then in foreclosure.   One of the properties
it is believed has since been sold.   She received $16,500 from
one of the co-conspirators in payment.   Ms. John believes that
she received $13,000.

**THE MORTGAGE ISSUE AND CRISIS**

        While Ms. John has no one but herself to blame for the
actions she took regarding the funds of the Caribbean Woman's
Health Association, her involvement in the mortgage fraud should
be considered in light of the concurrence of the industry
itself.   This Circuit has rejected an argument that the loss
amount should be affected by fluctuations in the mortgage
industry.   See United States v. Woolf-Turk, 626 F.3d 743, 747
(2d Cir. 2010).   However, economic reality permitted such
mortgage fraud schemes to be engineered by the persons who
sought out Ms. John as a straw buyer and the lenders who made
the enlistment of straw buyers a lucrative criminal endeavor.
It is true that a thief who steals from a man who leaves his
valuables lying around where anyone can steal is still a thief,
the person who is so eager to be stolen from can be seen to
reduce the moral culpability of a criminal by in effect creating
the inevitable condition for theft.   Judge Alexander Williams of
the District of Maryland wrote in United States v. Venson,
Action No. 08:09-cr-00088- AW 2011 U.S. Dist. LEXIS 6806, (D.
Maryland, Southern Division, January 25, 2011):

        Now the Court is quite mindful that without the
        assistance of the greed of the mortgage industry some
        of the damage, perhaps, could have been avoided. What
        is so troubling about the industry, including the

(victim) banks who ended up holding the note, is that so many in the industry are contributing to the offense by giving loans to practically anyone who requested them; never really checking the loan financial statements and paperwork; never doing much more than a cursory check to determine whether were material misrepresentations, lies, and fraud on the applications; and never questioning what likely were fraudulent appraisals of the properties. Clearly, the mortgage industry itself was part of the mortgage problem and the "mess" which this country has now inherited.

To that extent, Ms. John was both a criminal and one exploited by more sophisticated criminals, such that her moral culpability may be reduced as part of the Court's assessment under Title 18 U.S.C. § 3553 (a). As Judge Williams wrote, "the Court can consider the circumstances by which these victims (as part of the mortgage/housing industry) contributed to the overall environment which fostered these types of offenses."

**OBJECTIONS TO THE PSR**

Ms. John objects to Paragraph 9 of the PSR. We believe that the PSR should read that Ms. John was "compliant" and not complaint. Likewise she objects to Paragraph 43 of the PSR referring to her as a male: "A copy of his plea allocution…"

The defense also objects to Paragraph 40 which reads that the Government attributes to Ms. John a loss of $2,647,544.

As more fully explained herein the defense also objects to a Guideline calculation that as a specific offense characteristic adds 18 levels to the Base Offense Level of 7 predicated upon an amount of $2,647,544, which is the total amounts of the three loans without regard to any repayment of collateral provable at the time of the sentence. We believe that at least one of the properties has been sold in foreclosure allowing for recovery of part of the loss.

As a consequence, the defense objects to a Base Offense Level of 24 which with a Criminal History Category of I sets her advisory sentencing range at 51-63 months. The PSR recommends a sentence of 51 months without regard to any

Honorable Alvin K. Hellerstein
February 16, 2012
Page 5 of 52

government motions as to the offense level (PSR, p. 21, 22). The defense objects to the recommendation of 51 months as being greater than necessary and thus violative of the sentencing statute.

## A.    The Issue of Loss As A Measurement[1]

The PSR amount calculated the loss at $2,647,544. It claims that amount as loss by counting 100% of the intended loss of the attempt to get loans for the Uniondale property (PSR Paragraph 15).  Then it took 100% of the amounts of the loan either as actual loss or intended loss for the other properties (PSR Paragraphs 16, 23,) "the West 162 St property" at $1,350,000 and (PSR Paragraph 26, 33) "the Cathedral Avenue property".

The PSR calculates the loss at 100% which would appear to be impossible under the scenario involving residential real estate property.  Unless the property itself burned to the ground or toxic waste destroyed the real estate below the residential property, it is specifically and highly unlikely that there was 100% loss.

The PSR 100% method always guarantees the highest Guideline level of punishment and it is very easy to "calculate." At the opposite pole is the claim that there is no loss because no matter what the false statements are regarding the straw buyer, the underlying appraisal of the actual real property is accurate and the identity of the loan recipient is a real person, and thus the property retains its financial value. Therefore, the loan is no greater than the value of the residential property and thus the default such as it is, causes no loss since the property fully secured the loan, otherwise why would the loan have been made.  A third method of calculation is that of the "Equity Spread", which is measured by the difference between the amount that the bona-fide seller listed as the house's sale price, and the amount reported to the lender as the sale price.  If there is no difference or little difference in amounts, then the loss to the victim is profoundly less than the value of the loan.  Indeed it may alter what the value of the loan actually is.

---

[1]    The defense does not dispute the loss amount attributable to the embezzlement of government funds in Count 1.

Honorable Alvin K. Hellerstein
February 16, 2012
Page 6 of 52

        As a general rule, loss is the greater of actual loss
or intended loss.  U.S.S.G. § 2B1.1, cmt. n. 3(A). 'Actual loss'
means the reasonably foreseeable pecuniary harm that resulted
from the offense, while 'intended loss' (I) means the pecuniary
harm that was intended to result from the offense; and (II)
includes intended pecuniary harm that would have been impossible
or unlikely to occur.   U.S.S.G. § 2B1.1 cmt. (n. 3(A)(i-ii).
Because the loss caused by fraud is often difficult to determine
precisely, a district court need only make a reasonable estimate
of the loss.   "[L]osses from causes other than the fraud must be
excluded from the loss calculation," United States v. Ebbers,
458  F.3d .110,  128  (2d  Cir.  2006).   With  respect  to  the
methodology for calculating the loss, the note states only that
"[t]he  estimate  of  the  loss  shall  be  based  on  available
information, taking into account, as appropriate and practicable
under the circumstances." U.S.S.G. § 2B1.1 cmt n. 3(C) (iii).
United States v. Jacobs, 117 F.3d 82, 95 (2d Cir. 1997). In
United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995) the
Court wrote that calculating the amount of loss for purposes of
the sentencing guidelines is more an art than a science.  Courts
can, and frequently do, deal with rough estimates.

        The Application Note further provides that "the gain
that resulted from the offense [may be used] as an alternative
measure of loss only if there is a loss but it reasonably cannot
be determined." Id. cmt n. 3(B).   The Court may choose from
competing methods of calculating loss.

        In the context of mortgage fraud, the amount of loss
cannot be the entire amount of the loan for a variety of
reasons, none of which are addressed by the PSR.   Generally,
"'actual loss' means the reasonably foreseeable pecuniary harm
that resulted from the offense." U.S.S.G. § 2B1.1, App. Notes
3(A) (i).  Pecuniary harm is the harm that a defendant knows or
under the circumstances, reasonably should have known, was a
potential result of the offense.   U.S.S.G. § 2B1.1 cmt n.3 (A)
(iv).  This Circuit has rejected foreseeability issues involving
market factors when the investors' losses in housing were caused
in part by the defendant failing to record the victim's security
interest.  See Woolf-Turk, supra, 626 F.3d at 747.

        In the area of residential mortgage fraud, which is at
issue here, there is a viable question of what constitutes loss.
One measure is the entirety of the loan if there is a fraud such

Honorable Alvin K. Hellerstein
February 16, 2012
Page 7 of 52

that there is in property that even exists that secures the loan
or the property is so worthless as to make the loan worthless.
In the instant case, however, there was actual residential
property that secured the value of each of the loans.

But it seems clear that in the run of the mill
mortgage fraud case, when the Court is faced with the prospect
of sentencing a straw buyer as opposed to a person charged with
the management of the security interest itself, the loss which
is based upon the amount of the loan should be reduced by, at
minimum, any amount recovered upon foreclosure by the mortgage
note holder.  Further, there is an issue of how much the banks
actually loaned for the purpose of the property.  Put another
way, the loan may go into foreclosure as a result of the fraud,
but the sale of the property even at a foreclosure sale must
create some offset regarding the loss.  Just as the loss need
not be assessed with exactitude, the Guidelines appear to not
require the defendant to be punished with the same Dickensian
exactitude.  See U.S.S.G. § 2B1.1 n 3 (E) (ii) provides for
credits against loss.

Loss shall be reduced by the following:

(ii) In a case involving collateral pledged or
otherwise provided by the defendant, the amount the
victim has recovered at the time of sentencing from
disposition of the collateral, or if the collateral
has not been disposed of by that time, the fair market
value of the collateral at the time of sentencing.
U.S.S.G. § 2B1.1 cmt. (n. 3(E)).

Similarly, U.S.S.G. § 2B1.1 n. 5 (D)(i) provides that
Loss shall not include the following: interest of any kind,
finance charges, late fees, penalties, amounts based on an
agreed-upon return or rate of return, or other similar costs.

The actual loss is the loss amount reported by the
"victim" to the government and/or Probation, but it depends who
is the victim in this matter - it is clear who wants
restitution.  The original "victim" lenders might not be the
same "victim" reporting a loss because the original "victim"
lenders often will have sold the loan to some other entity prior
to the house going into foreclosure.  The original lender may
fund the loan with the sole purpose of selling it to someone

Honorable Alvin K. Hellerstein
February 16, 2012
Page 8 of 52

else.   The crucial issue in measuring loss in the case of the
straw buyer in a mortgage fraud case under Application Note 3,
is what "is the amount recovered by the victim from disposition
of the collateral?"   When any of the victims might not be the
original lender, then their loss is not a proper dollar for
dollar substitute for loss.   Similarly, the restitution amount
is not a good substitute for "the amount recovered from
disposition of the collateral."   Because there are other
exclusions from loss that occur as a result of movement of the
loan in the secondary market or even in bundling by mortgage
brokers.   In this case, the entities seeking restitution include
the Bank of America and Aurora Bank FSB of Jersey City, New
Jersey.   It appears that Aurora was a direct victim but the
relationship between WMC and Bank of America, a mortgage company
is unexplained by the PSR.

Unlike Woolf-Turk, in the case of the straw buyer of a
piece of property, the interest of the banks is collateralized
by the real property securing the mortgage loan.   Ms. John's
open and notorious role as the named straw purchaser, albeit
without regard to how her signed sworn statements were to be
used, did not make foreclosure more difficult or add to a loss
figure, because her identity was known and the security interest
was in fact secured by the victim bank.

Unfortunately, in a mortgage fraud case, the Woolf-
Turk interpretation of the reasonable foreseeably language has
been given an unreasonably narrow interpretation.   This narrow
interpretation results from the use of a two-step approach.   In
step one, the court determines the reasonably foreseeable amount
of loss at the time the crime was committed with no
consideration for market conditions or other external factors.
It appears that that in a mortgage fraud case the reasonably
foreseeable amount of the loss will always be the amount of the
loan.   The second step requires the court to credit the
defendant for the market value at the time of sentence of any
collateral sold.

Here the split in logic is designed solely to punish a
defendant.   Under any scenario in this fraud, everyone involved
including the victim banks know that residential houses retain
at least some value in the face of a fraudulent transaction.   At
the plea, the DOI Investigator went to great lengths to point
out that part of Ms. John's knowledge included that she had

Honorable Alvin K. Hellerstein
February 16, 2012
Page 9 of 52

obtained non-fraudulent mortgages in the past and had to know
not to sign papers in blank.  By the same degree, she would also
have to know that a mortgage on a piece of residential property
is secured by the value of the residence including the land.
Given this prior knowledge, used for imputation of knowledge and
guilt, Ms. John should also get the benefit of that knowledge in
terms of loss and foreseeability.

     The value given to this offset amount carries with it
no consideration that it be reasonably foreseeable to the
defendant.  The credit will be whatever the value of the
collateral is at the time of sentencing with no further
analysis.  This eviscerates the text and meaning of U.S.S.G. §
2B1.1, App. Notes 3(A) (i).  Since the total amount of the
unpaid principal is always the "actual loss", as is the case in
this PSR, there should be a comparable causation standard in
assessing the foreseeability of market forces in the mortgage
industry.  A sentencing court should employ a mechanism that
"incorporates a causation standard that, at a minimum, requires
factual causation (often called `but for' causation) and
provides a rule for legal causation."  See United States v.
Olis, 429 F.3d 540, 545 (5th Cir. 2005).  In other words, a
sentencing court should determine those reasonably foreseeable
losses caused by the fraud, as opposed to those losses caused by
independent factors and therefore not reasonably foreseeable.

     The mechanism for determining actual loss — deducting
the fair market value of the real estate at the time of
sentencing from the amount of the loan would be appropriate
except for the unprecedented, unforeseen collapse in real estate
values, which occurred in 2007 and thereafter.  This collapse,
which was unforeseeable to the market itself and to the
financial giants of the world, should not be "foreseeable" by a
straw buyer when the rest of the world missed it.  As
articulated by the Ninth Circuit, a court, "must take a
realistic, economic approach to determine what losses the
defendant truly caused or intended to cause."  United States v.
West Coast Aluminum Heat Treating Co., 265 F.3d 986, 991 (9th
Cir. 2001).  From 1963 until early 2007, any defendant who
obtained a loan by fraudulent means, collateralized by real
estate, reasonably expected that the value of that collateral
would remain the same or increase, and as a result, would have
been able to reasonably foresee the potential pecuniary effect

Honorable Alvin K. Hellerstein
February 16, 2012
Page 10 of 52

of hers crime to the lender.    Indeed, the expectation was not
confined to criminal defendants.    It was held by each and every
segment of the mortgage market.    This necessarily means that the
current mechanism for determining loss, if used in a sentencing
hearing any time after the Great Depression but before 2007,
would have provided a sentencing court with the type of "a
realistic, economic approach" discussed in West Coast Aluminum
Heat Treating Co., Id.

        However, beginning in approximately February of 2007,
radical unforeseen depreciation of real estate values across the
United States renders this approach inappropriate, in that it
fails to account for losses in the value of real estate that are
completely   unrelated   to   the   crime   before   the   court   for
sentencing.    The issue of determining loss based on instruments
that suffer rapid devaluation from conditions unrelated to the
criminal conduct involved is not unprecedented.    A number of
sentencing courts have dealt with this type of issue.    This is
often seen in securities or commodities cases; the value of
these types of instruments is often influenced by a universe of
factors, often unrelated to the criminal conduct.    The methods
used by courts in these types of cases are instructive because
they must undertake the process of determining the amount of the
loss to the value of the security, which resulted from the fraud
as opposed to unrelated market conditions.    See generally, Olis,
429 F.3d 540 (5th Cir. 2005), United States v. Ebbers, 458 F.3d
110 (2nd Cir. 2006) and United States v. Rutkoske, 506 F.3d 170
(2nd Cir. 2007).    In Ebbers, the Court insisted that those
losses "from causes other than the fraud must be excluded from
the loss calculation."    Ebbers, at 128.    A sentencing court
should disentangle the underlying value of the property's
inflation of that value due to the fraud and either inflation of
deflation of that value due to unrelated causes.    See United
States v. Zoplin, 479 F.3d 715, 719 (9th Cir. 2007).    In the
case of the garden variety mortgage fraud case in assessing the
loss issue relating to the acts of a straw buyer, Woolf-Turk
sets a rule of law for a different type of fraud and loss.    In
the case of mortgage fraud, the reason for drop in value was not
reasonably foreseeable or related to fraud, where it is the
product of the real estate market and the purchase of mortgages
by banks.    While Woolf-Turk rejects this measurement in the case
where   the   defendant   defrauded   the   victims   by   never
collateralizing the property and thus the loss of the victims

Honorable Alvin K. Hellerstein
February 16, 2012
Page 11 of 52

remained constant, in the instant case Ms. John's fraud secured
the banks from loss by collateralizing property that retains
value at this writing.  Application Note 3 is the method most
consistent with the true nature of Ms. John's offense (i.e.
fraudulently obtained loans collateralized by property) and is
supported by case law.  See United States v. Calkins, 190 Fed.
Appx. 417 (6th Cir. 2006) (unpublished); United States v.
Weidner, 437 F.3d 1023 (10th Cir. 2006); United States v.
Staples, 410 F.3d 484 (8th Cir. 2005); United States v.
McCormac, 309 F.3d 623 (9th Cir. 2002); United States v.
Johnson, 16 F.3d 166 (7th Cir. 1994); but also see United States
v. Gibson, 197 Fed. Appx. 661 (9th Cir. 2006) (unpublished).

## B. The Banks Should Turn Over The Information In Order To Establish The Loss Amounts

The Guidelines require that the value of the
collateral be revealed to the Court at the time of sentencing.
The government bears the burden of establishing loss in the
first instance.  Asserting the full amount of the loan as the
loss is contrary to the findings required by the Guidelines.
Without knowing at the time of sentencing what happened to the
loans, whether they were sold on the secondary market, or has
the property been successfully sold in foreclosure, there is no
reliable amount of loss available to measure the loss, even
under the Guidelines requirements.  At the present time, the
government and the PSR make no attempt to indicate to the Court
what the current air market value of the collateral is.  In the
case of a straw buyer, the Guideline directs the Court to
collateral pledged by the defendant Ms. John should receive
credit against the loss on her offense level because she was the
person that pledged the collateral, not the others in the
conspiracy.  Indeed, Ms. John repeatedly made it clear that her
participation damaged her credit.

This is a knowable number in the possession of the
victims, and it should be provided to the government and then to
the Court for the purpose of a hearing on the issue of loss if
necessary.  The restitution amount cannot be taken at face value
as the claimed loss.  The PSR references the HUD-1 which is the
official record of the original fraudulent transaction.  It
appears that Ms. John, the straw buyer obtained 100% financing,
then the HUD-1 will show the total loan amount (which is also

Honorable Alvin K. Hellerstein
February 16, 2012
Page 12 of 52

the sale price). But there is also a HUD-1 for the next
transaction either a regular sale or a foreclosure sale. This
HUD-1 is the official record of the transaction in which the
entity that was "stuck" with property sold it at foreclosure.
It is not referenced in the PSR. It will show the sales price
of the property and the amount that the victim received from the
disposition of the collateral. It will show any questionable
expenses. The parties that should have a copy of this document
are: the new buyer, the seller (which may be the original
lender), the title company, and the lender. One should be able
to determine the new buyer by accessing county records or online
appraisal documents. Also, if the original "victim" lender
(listed on the original HUD-1) did not sell the loan on the
secondary market, then it will most likely be the seller at
foreclosure.

In United States v. Confredo, 528 F.3d 143 (2d Cir.
2008), the Court held that a defendant should have an
opportunity to persuade the sentencing judge that the loss he
intended was less than the face amount of the loans. A
defendant who applied for, or caused someone else to apply for,
a $1 million loan, fully expecting at least $250,000 to be
repaid, intended a loss of no more than $750,000 (although, if
no repayment is made, he would be subject to punishment for an
actual loss of $1 million). Similarly, a defendant who applied
for, or caused others to apply for, ten $1 million loans,
expecting at least three to be rejected, intended a loss of no
more than $7 million (although, if all were accepted and none
was repaid, he would be subject to punishment for an actual loss
of $10 million). The Court should determine the extent, if any,
to which a defendant has proven a subjective intent to cause a
loss of less than the aggregate amount of the loans, in which
event the applicable loss calculation should be based only on
the intended loss, unless the actual loss is higher.

The PSR does not explain how the institutions which
are victims arrived at its loss calculation. It may be
necessary to trace the progression of the loan from entity to
entity. This itemization may well include amounts such as
unpaid interest, discounts for preferred buyers, discounts for
buyers that purchase multiple properties, late fees, penalties,
etc. This is significant because U.S.S.G. § 2B1.1, comment.
(n.3) (D) (i) provides that loss shall not include interest of

Honorable Alvin K. Hellerstein
February 16, 2012
Page 13 of 52

any kind, finance charges, late fees, penalties, amounts based on an agreed upon rate of return, or similar costs.

Similarly, the history of a particular property show that the "victim" disposed of the collateral (by selling the house at foreclosure) at an amount that is substantially below market value and that, in some instances, it would have been possible for the victim to have turned a profit as a result of the defendant's offense. If the difference between the loan amount and the appraised market value is only 15% of the Guideline loss amount, this gives rise to an 18 U.S.C. § 3553(a) argument.

## WHY A NON-GUIDELINE SENTENCE IS APPROPRIATE

### INTRODUCTION

#### A.    REASONABLE SENTENCE

A sentencing decision is made after conducting an appropriate evaluation under the dictates of Title 18 U.S.C. § 3553.  The court considered "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the Guideline computation, deterrence issues and other elements, and a sentence is crafted that is "sufficient, but not greater than necessary, to comply with" statutory purposes.  18 U.S.C. § 3553(a).  A sentencing judge is no longer bound by the penal theories that inform the guidelines, and may substitute a theory of their own if doing so would advance the aims of the § 3553(a) sentencing factors.  See Spears v. United States, 555 U.S. 261, 129 S.Ct. 840, 843-44, 172 L.Ed.2d 596 (2009); Kimbrough, 552 U.S. 87, 101-02, 128 S.Ct. 558; Rita v. United States, 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).  The Sentencing Commission performs its function at wholesale while district courts in sentencing, perform their function at retail.   Rita v. United States, 551 U.S. 338, 347-348 (2007), comparing 18 U.S.C. § 3553(a) with 28 U.S.C. § 991 (b). The sentencing court must make an individualized assessment based on the facts presented and upon a thorough consideration of all the 3553(a) factors. Gall v. United States, 552 U.S. 38, 50 (2007).   The sentencing commission fulfills an important institutional role but the sentencing court has greater familiarity with the individual case and defendant before her for sentencing. Kimbrough v. United States, 552 U.S. 85, 109

Honorable Alvin K. Hellerstein
February 16, 2012
Page 14 of 52

(2007). Even when a particular defendant presents no special
mitigating circumstances such as no "outstanding service to
country or community", a sentencing court may nonetheless vary
downward from the advisory Guideline range based solely on the
sentencing court's disagreement with the Guidelines. See Spears
v. United States, 129 S.Ct. 840, 842 (2009). District courts are
"generally free to impose sentences outside the recommended
[Guidelines] range" but "must consider the extent of the
deviation and ensure that the justification is sufficiently
compelling to support the degree of the variance." United
States v. Stewart, 590 F.3d 93, 135-136 (2nd Cir. 2009). The
Court has discretion to deviate from the Guidelines in even a
"mine run" case. A variance is especially appropriate in Ms.
John's case.

The Supreme Court issued decisions in Rita, supra,
"[T]he sentencing court does not enjoy the benefit of a legal
presumption that the Guidelines sentence should apply"; Id. at
351. Kimbrough, Id., ("[T]he statute still requires a court to
give respectful consideration to the Guidelines[,]" but permits
the court to tailor the sentence to "impose a sentence
sufficient, but not greater than necessary" to accomplish the
goals of sentencing pursuant to 18 U.S.C. § 3553(a)); Gall, 552
U.S. at 50 ("extraordinary" circumstances are not required to
justify sentence outside the guidelines); Spears v. United
States, Id. (explaining that Kimbrough holds that a categorical
disagreement with and variance from the crack cocaine Guidelines
is not suspect); or Nelson v. United States, 129 S.Ct. 890 (Jan.
26, 2009) (reiterating that the Guidelines are not mandatory on
sentencing courts and are not to be presumed reasonable). The
body of this decisional law allows a Court to craft a sentence
that is appropriate after considering the Guidelines and
considering whether the Court agrees with the policy issues
behind such Guidelines, when sentencing the particular defendant
and considering all the factors of 18 U.S.C. § 3553 (a). Where
the Court has a legitimate policy disagreement with the
Guidelines, a variance is appropriate.

Ms. John seeks a sentence outside the Guideline range,
a non-Guideline sentence on the basis of a number of factors.
First on the basis of whom she is apart from this case.
Secondly, the Guideline scale of a total of 25 levels of
punishment is the product of a scaled economic guideline,

U.S.S.G. § 2B1.1, that is not based upon empirical evidence or data such that it serves the purposes of sentencing under 18 U.S.C. § 3553. Second, the Guideline calculation fails to take into account properly Ms. John's public service, her age, the especially low risk of recidivism, and the collateral punishments including a very public shaming. Third, the range demanding incarceration is far greater than necessary to promote the goals of sentencing in this case.

## B. WHO IS SHE REALLY?

### 1. The Letters From The People Who Know Her Best

Finally, the most compelling reason for the imposition of a non-Guideline sentence is demonstrated by the outpouring of letters of people from all walks of life who wrote to speak for themselves, their loved ones, living and dead and their communities. The body of letters, the history and circumstances of Ms. John, is a set of extraordinary facts so unique as to justify a sentence reflective of the life she has willfully led in public service, AIDS/HIV and public health as well as her church.

The PSR is functionally silent on the good works attributable to Ms. John. She has committed serious crimes, but for a decade or more before she has given of herself to the community of which she is a part, to Trinidad and Tobago and to Ghana - places in the world that we fail to give even a passing thought. In large measure, this case has rendered Ms. John down to no more than a criminal in the places where she once walked with justifiable pride in her achievements.

Marilyn John was for the longest time, a law abiding citizen and an honorable public servant. Her devotion of her life's work to the unfortunate afflicted with HIV and AIDS as well as actively seeking to stem the tide of infection in communities of color, should entitle her to receive credit for all the good she has done and her immediate misconduct assessed in the context of her overall life to this moment, it should be now at the moment of her sentencing, when her future hangs in the balance. Such a judgment animates all of religious life and in reality it animates all of secular life as well. This elemental principle of weighing the good with the bad, the idea that a person is much more the worst deed she has done, is what

Honorable Alvin K. Hellerstein
February 16, 2012
Page 16 of 52

is meant by considering the history and characteristics of the defendant.

How one can reconcile the criminal behavior with the public devotion to the needy and the desperate is part of the work of sentencing. How to align for the purposes of judgment, Ms. John's deeply held spiritual belief and her works in the area of the spiritual health and well-being of many others with the acts of criminality, is to plumb the very inconsistencies that in small amounts but in uniform measure make us human, fallible and corruptible. How the drive to do good works leads to self-regard so as to justify self-reward and how a willingness to help for a small benefit leads to criminal behavior is part of assessing the flawed humanity of a person who stands before the Court.

C.   THE LETTERS AND WHAT THEY REPRESENT

One guide to the inner self of the person to be sentenced can be found in the letters and words of the persons who in a moment of crisis and need step forward to vouch for the human at the bar for judgment. Like oath helpers which are the foundation of the jury system, the persons who emerge to speak for the defendant to the Court have a unique perspective not available to the quick assessment checklist driven PSR writers. While friends and family may lack the necessary objectivity, they do possess the certain information that allows the Court to bridge the gap between the cold objectivity of the probation report and recommendation and the warmth of thee loving souls who speak for the defendant.

People from different walks of life and from all phases of her life have written to the Court to speak for her and her character over a lifetime. A person, who is fundamentally corrupt or of a criminal character, would find it difficult to compile such letters.

D.   THE LEGAL SIGNIFICANCE OF THE LETTERS TO THE COURT

The letters address the elements of a life that is not considered in the numerical assessment of the Guidelines and are absent in their calculation. However, according to United States v. Rita, 127 S.Ct. at 2473 (Stevens, J. concurring), they are matters that must be considered by the sentencing judge. In

United States v. Howe, 543 F.3d 128 (3d Cir. 2008), the Court
affirmed a non-Guideline sentence in part on the basis of the
more than forty letters describing the defendant's honorable
character, as well as his church going and his role as a devoted
father, son, and husband.  The Court took note of the fact that
he was truly remorseful.  In Howe, the Guideline calculation was
a sentence of 18-24 months and the Court issued a sentence of
two years' probation on the basis of a conviction for two counts
of wire fraud.   The Court also saw the crimes as  isolated
mistakes albeit an extraordinary serious crimes.   Until this
point, he had led an honorable and lawful life reflected in the
letters of persons.   See also United States v. Chase, 560 F.3d
828, 831 (8th Cir. 2009).  Ms. John similarly has had a life of
honorable character, religious involvement and been a devoted
single mother.   Her acts after her arrest demonstrate true
remorse and a desire to expiate her guilt and make amends to
society, backed up by her acts.

### E.   LIFE, HISTORY, BACKGROUND AND CIRCUMSTANCES

#### 1.   The Family

Karla Scipio is Ms. John's younger sister. In her
letter she describes the adversity that Ms. John overcame as
child to make herself into a professional, educated and
successful (Exhibit A).  She describes a home that was dominated
by an alcoholic and physically abusive father.   Despite such
conditions Ms. John passed local examinations in Trinidad and
Tobago so as to be able to further her schooling and attend the
best high school for women on the island nation.  She left the
nation and her father's home to marry here in the United States
but ended up in a relationship even worse where she was battered
by her husband, even after the birth of her children.  Despite
his battering of her, she continued her education and graduated
from Long Island University with a Master's of Science in
Community Health.  It was Marilyn John that Ms. Scipio said set
the standards for achievement in the family.

Ms. Scipio also makes it clear that along with
bettering, Ms. John has successfully raised two sons on her own
as a single parent.   She was able to set such standards that
allowed her own two sons to become successful first as college
graduates and then as responsible men in the world.  Ms. Scipio
discussed the impact of Ms. John's faith, ministering to others,

Honorable Alvin K. Hellerstein
February 16, 2012
Page 18 of 52

her HIV/AIDS advocacy prevention education, and her good works. She also made it clear that Ms. John inspired her to become a nurse educator. She wrote of Ms. John, "Her desire to educate, equip, and empower young people has also greatly influenced me. I can truly say that the she has pushed and pulled [me] to be more selfless and less selfish. She has always encouraged me to putting God family and friends first." She also asked the Court for mercy for Ms. John. "I pray that you would have mercy on my sister who has never been in trouble in her life. She has been a blessing to her brothers and sisters and a rock to her many nieces and nephews and most importantly a help to the hurting people of the world."

Both of Ms. John's sons wrote to the Court. Kendall John is her oldest son. He wrote that hers mother's presence has blessed and affected so many people (Exhibit B). Apart from the love and support she has provided to him and his brother, to friends of hers and others in their circle of acquaintances, he tells the Court of his mother's intervention on behalf of an ex-girlfriend who was apparently gang raped. Authorities failed to do anything about the claim. Kendall John states that it was his mother who intervened to move the case along. She also provided counseling to the ex-girlfriend. He asks the Court to give his mother another chance because this case "does not define the type of person she truly is."

Ms. John's other son, Jerell, a recent graduate of Full Sail University in Florida reports that he completed a four year program in two years in part based upon the encouragement and love of his mother. He wrote that as a single mother, Marilyn John instilled sound values by her teaching and her life. He stated "Success was one of the things that she instilled us, along with always being a blessing to others, education, believing in us and doing the right thing" (Exhibit C). Jerell explains that as a young black man growing up in Brooklyn, his mother cared for and prayed for her sons to succeed. He said that she always made sure that there was a positive male role model, such as a godfather for the boys to be guided by. Most significantly he was aware that any of his school mates led troubled and chaotic lives. It was to Marilyn John that many of his classmates and peers turned to for advice and counseling. "On a Wednesday evening you can see my mom sitting on our stoop surrounded by at least eight teenagers."

Honorable Alvin K. Hellerstein
February 16, 2012
Page 19 of 52

She would "counsel them, pray for them, work on the self-esteem and get them involved in community work". He tells the Court that she is still a role model for persons locally, nationally and internationally.  He states "I know who my mom is and I am proud to be her son."

Merceider Williams has been Ms. John's friend for over 35 years and considers herself Ms. John's best friend (Exhibit D).  She made Ms. John the godmother to her son.  She states that she "can trust [Marilyn John] with her life."  She in turn is a godmother to Marilyn John's son. Her husband is the godfather of Ms. John's other son.  She speaks of the striving to make a better life for her two sons and has succeeded in raising her boys to be "great men in society."

Hamiyda Scipio is Marilyn John's niece. She states that Ms. John has been her mentor, influencing her and encouraging her to pursue a career in the health care industry. She was introduced to public health and the need preventive health to save and improve lives. She seeks for her aunt a second chance (Exhibit E).

Ms. John's friend Saundra Shuler wrote the Court from South Carolina to speak of her twenty-five year friendship with Ms. John, calling her "prudent, conscientious, hardworking and well regarded among her peers" (Exhibit F).  She calls her a community minded individual who always puts the needs of others before her own.

Vernice Henderson wrote of Ms. John's role in the community.  In the few months they have known each other, Ms. John has "improved all aspects of her life" (Exhibit G).  Ms. John has taught her to be a "progressive individual" including how to organize groups, to speak in public, and to have self-confidence.  She speaks of Ms. John's "just and spirited judgment" and her "excellence, perseverance and persistence". She calls her a great leader in her community citing her roles as mentor to the young children and a surrogate mother.

## 2.    The Public Health World

From New York City to Ghana, letters have come to the Court.  Millicent Freeman the New York City Department of Health Director of Outreach and Public Training wrote of her fifteen

Honorable Alvin K. Hellerstein
February 16, 2012
Page 20 of 52

year association with Ms. John. She called her "honest, straightforward and completely committed to serving communities". She stated that had the world had more people like Marilyn John "we would have sustainable solutions to many of our social and health problems" (Exhibit H). She called her a vital resource to New York City and the world.

From Ghana, Dr. Prince John Tetteh the President of A Heart Relief Organization, a NGO based in Accra wrote that Ms. John was the co-CEO in 2002. The leadership she provided allowed for the expansion of the organization. Beginning in 2001 with her invitation by the Government of Ghana to be a keynote speaker for the county's World AIDS Day, she made a major impact upon Ghana and the issue of AIDS. She worked to introduce the use of the female condom into the Ghanaian culture where sex itself is taboo, and women do not speak publicly about such acts. She engaged in recasting such mores in order to save lives from the spread of AIDS. She has presented at several conferences in Ghana. She has adopted hospitals and orphanages. She aided in the obtaining of six week fellowships for health professionals in Ghana to be trained at a hospital in New Jersey (Exhibit I). Dr. Tetteh also stated that Ms. John worked on "women and empowerment issues, pregnancy proper nutrition, and other medical missions were activities that she engaged in on a voluntary basis." At the present time due to her case, she is not able to travel, but Dr. Tetteh stated that Ms. John continued to work for human health issues. She connected A Heart Relief Organization with a resource in the United Kingdom which provides medical equipment to third world nations. She is trying to aid in the connecting of two Accra hospitals with United States hospitals, in a kind of exchange program. Ms. John has also been trying to coordinate performers for concerts to raise awareness regarding AIDS. Dr. Tetteh states that "Ms. John is a visionary who has the passion for humanity... her vision has and continues to be implemented around the world". He calls her "A tremendous asset and gift to humanity".

Yvonne Williams of Karing with Individuality of Alexandria, Virginia, wrote to the Court that she had worked with Ms. John in various capacities for over four years. She writes of Ms. John providing facilitation services for workshops and training regarding woman's health relative to HIV and other sexually transmitted diseases. "She provided superior

Honorable Alvin K. Hellerstein
February 16, 2012
Page 21 of 52

information relative to prevention, treatment and holistic care
of women" (Exhibit J). "Ms. John's contribution to the field of
public health is invaluable to women within the United States
and internationally. Her skills and knowledge are needed
especially during this time of severe health cutbacks and poor
health outcomes." She seeks the Court's compassion and care in
the sentence.

Beverly Gibson-Mohammed wrote from the perspective of
knowing Ms. John first professionally when they served on a
special panel for the Center for Disease Control. She attended
Ms. John's presentation concerning the use of female condoms to
prevent the spread of sexual disease and HIV/AIDS. She wrote
"Marilyn has made outstanding contributions to promoting healthy
lifestyle and helping to reduce the spread of HIV/AIDS in
Fairfield County, Connecticut (Exhibit K). Gwen Carter has
known Marilyn John for fifteen years both personally and
professionally. She said that she was immediately drawn to Ms.
John by "her compassionate and giving nature toward the
clientele with which she worked as well as her colleagues"
(Exhibit L). She reported that at the New York City Department
of Health, Ms. John designed and implemented the Female Condom
Education and Distribution Program. She also developed an
Immigrant HIV/AIDS program. Significantly, she blended two of
her most important passions by mobilizing New York City's faith
community into a coalition of over 100 churches to address
health and social service issues. Ms. Carter wrote of Ms.
John's unique skills "including the ability to translate
research into programs, work with diverse groups and
communities, and build effective coalitions and teams and design
and implement curricula. In addition, she has excellent verbal
and written skills, is an experienced manager and supervisor and
has strong budgetary and administrative skills." She also knows
her personally as kind compassionate, reliable and trustworthy.
She sees the best in everyone, sometimes to her detriment. She
is of strong character and values. She is proud to know her and
call her "friend".

Aida Leon of Amethyst Woman's Project has known Ms.
John for the past six years. She asks the Court to consider the
full measure of Ms. John as a person, seeing her as an asset to
her community and to those who know, love and respect her
(Exhibit M). Ms. John is on the Board of Directors of Amethyst

Honorable Alvin K. Hellerstein
February 16, 2012
Page 22 of 52

and Ms. Leon is the Executive Director.   She values Ms. John's
judgment and her contributions to the Board.   She noted that Ms.
John became a member of the Board because she believed in the
mission of the organization to restore hope and dignity to the
lives of women adversely impacted by substance abuse, HIV/AIDS,
and domestic violence, which resonated with Ms. John's sense of
social justice and her values as a Christian lay minister.   She
stated that Ms. John was "an extraordinary woman of genuine
character."

       Reverend Ambrose Chalokwu of the Redemption Outreach
International wrote of knowing Ms. John for over eight years.
He said that Ms. John has been very instrumental in mobilizing
youth, women and the community to respond to the impact of
HIV/AIDS on the African, African American and Latino communities
in Far Rockaway and beyond.   She has aided Redemption Outreach
in establishing collaborative relationships with national
leadership organizations as well as the City of New York.   She
has also made presentations at the Church in the area of AIDS
education.    He states that he "would vouch for her always"
(Exhibit N).

       Paulette Murray wrote knowing Ms. John for more than
ten years in various capacities.   Currently she is the Bishop of
Cathedral International Lighthouse on Power.   She has been part
of Ms. John's missionary work in Europe, Africa and the
Caribbean.    When Ms. Murray retired, Ms. John led her to a
career in Public health by becoming involved in HIV/AIDS
Community Mobilization. She has focused on issues of HIV/AIDS
for African American Women.   Ms. John aided in securing funding
for Ms. Murray's group for prevention and AIDS testing.   She
states that Ms. John's contributions have changed many lives and
impacted communities throughout the world. "Her life continues
to illuminate the lives of many individuals including mine and
my family" She continued citing Ms. John's passion for humanity,
her brilliance and her dedication. "Ms. John continues to touch
my life and those of others in spite of her situation. I stand
behind her and hope that you can see her for who she really is."
(Exhibit O).

       Ann Marie John knows Ms. John for the last sixteen
years.    She has worked with Ms. John in the building of a group
called New World Creations involved in Caribbean AIDS education.
She calls Ms. John a "mentor and colleague."   She sees Ms. John

as "an inspiration" in the fight against the spread of AIDS in minority communities. Acknowledging the circumstances of a criminal case, Ms. Ann Marie John retains her faith in Marilyn John's good moral character. She calls her "a decent person at the core" and asks the Court to accord her the "chance" to "continue to be a contributing member of society" (Exhibit P).

Angelita Lindsay asserts to all that she considers Marilyn John a selfless community activist (Exhibit Q). She tells the Court that Ms. John came into Ms. Lindsay's life when her brother was dying of AIDS. Ms. John educated the Lindsay family about AIDS, the medical symptoms, and aided in the dealing with the emotions tied to the certain knowledge that her brother would die. Ms. John guided and counseled Ms. Lindsay. Ms. John also provided more than spiritual guidance. As Ms. Lindsay struggled to create her own production company, Ms. John helped develop the business, produce a business plan and taught her how to structure and run her small business. Ms. Lindsay points out that Ms. John never sought payment but only responded to need and potential. Ms. Lindsay refers to Ms. John as Mom.

Bonnie Harrison of the GRIOT Circle, Inc. has been a professional colleague of Ms. John for more than thirty years. She speaks of Ms. John and her influence over the lives of countless individuals infected with and affected by HIV/AIDS. She calls her a frontrunner in the efforts to provide small community based organizations to serve this population. She wrote of Ms. John's "unusual degree of courage and altruism during the early days of the pandemic". She was one of the few people who did this work "when the climate was not as accepting as it is now for people whose sexual orientation or drug taking behavior was not consistently with that of the main stream." She speaks of Ms. John donating many hours of her personal time running errands, finding and providing food and clothing as well as prayer and reassurance to those who had lost material things, their health and hope. Ms. Harrison relates that Ms. John became a resource to the City Department of Health, designing the Female Condom Education and Distribution program which grew into global initiatives. She closes with a request and encouragement that Ms. John's "humane efforts and professional endeavors" be used to outweigh anything else in her case (Exhibit R).

Honorable Alvin K. Hellerstein
February 16, 2012
Page 24 of 52

    Linda Joyner writes from the perspective of working
with Ms. John for three years at the New York City Department of
Health.  She calls her a mentor and friend.  She states that Ms.
John gave clear guidance and exceptional leadership skills to
their work unit.  She stated that the "passion" Ms. John showed
in the community brought forth ground breaking innovated ideas
to reduce the risks to women in acquiring or transmitting of
HIV.  Ms. John's program became the model for the program used
in other states, cities and nations.  Ms. Joyner attributes her
growth and development in the area of public health to Ms.
John's confidence, mentorship and professionalism.  She calls
her "fair honest and trustworthy" in all situations and in her
dealings with others (Exhibit S).

    Wendy Mitchell has been friendly with Ms. John for the
last six years after meeting at a health fair where Ms. John
spoke on the issues of Domestic Violence and HIV Prevention.
Ms. Mitchell was so impressed that she decided to confide in Ms.
John about her own domestic violence.  Ms. Mitchell states that
because of Ms. John's work in the area of infant mortality
reduction and Ms. John's teaching and workshops, "thousands of
new born infants' lives have been spared."  She calls her a
great motivator making a great impact on all around her.  She
calls her "a source of inspiration."  She states: "I am grateful
for women like Ms. Marilyn John who continues to inspire us as
daughters and mothers that we can be so much more than an abused
housewife, but that we can achieve all that we put our minds to
with hard work and perseverance."  She signs her letter "A Life
Impacted" (Exhibit T).

    Stanislaus Jones, Director of the Center for Zoe Life
of Richmond, Virginia, also wrote to the Court about her
relationship with Ms. John.  She first met her when Ms. John
spoke to community leaders in Washington, D.C.  She spoke in
favor of a commitment to a life of abstinence.  They have worked
together to bridge the racial, gender and generational gaps in
various cities of the United States.  She speaks of Ms. John's
role as a life changing mentor in the lives of women, including
aiding them in life skills developments.  She speaks of Ms.
Johns "impromptu selfless decisions which opened doors for
others", giving up matters that would have aided herself to aid
others.  Ms. John gave up such an opportunity to support Ms.
Jones.  She calls her a "faithful friend", a "faithful mother"

and "promoter of high character development in people" (Exhibit U).

Another person who began as a listener and ended up as a mentee and a friend is Patricia Inniss. She relates that Ms. John is well respected for her work locally, nationally and internationally. Ms. John has inspired Ms. Inniss' community activism. She sees Ms. John as a mother figure to herself and many others. She relates that Ms. John has carried on her work in providing services to individuals and the community in need during the entire period that she has been facing these charges (Exhibit V).

### 3.   Trinidad and Tobago and Ghana

As evidenced by the letters of Karla Scipio, Ms. John's sister, Ms. John did not confine her advocacy and her concerns to the narrow world of New York City. Aware that the spread of HIV/AIDS was far more severe in places such as the island nations like her home country of Trinidad and Tobago and even more widespread and fatal on the continent of Africa, Ms. John took her crusade against the spread of the disease to Trinidad and to Ghana. Significantly she took her people with her. In 2005, Ms. John was part of a health care team that went to Trinidad. The hearth team provided pap smears, breast examinations and other lifesaving screenings to people. These screenings served a population which otherwise would never have received any such vital preventive attention. Ms. Scipio said that the trip opened her eyes to the "needs of the disadvantaged and voiceless members of our society." In 2006, Ms. John again with Ms. Scipio traveled to Ghana on another missionary trip, along with members of Ms. John's own family. Ms. John also took her son Jerell on these missions to other nations. He said that he witnessed first-hand how she cared for the least fortunate, provided training for government workers and even adopted orphan children." He said that this moved her tremendously as a young man.

### 4.   The Spirituality Of Ms. John

One of the anchors of Ms. John's life is her spirituality. She herself is a lay minister. She has actively ministered to many people in need. Carmella Alston wrote of Ms. John interceding with the District Attorney's Office by

mobilizing local officials to gain attention for Ms. Alston's plight. Her intervention forced the Brooklyn police to intervene on her behalf. But Ms. Alston also speaks more significantly of the spiritual aid Ms. John gave her. Ms. John has people from her church and her prayer family to look in and call upon Ms. Alston to check on her well-being. They prayed over her every day and with Ms. John's help and the grace of God grew stronger. She calls her a second mother (Exhibit W).

Madona Liverpool also addressed Ms. John's spiritual activities. She tells of going to Ms. John's church to her Ms. John minister (Exhibit X). The sermon, Still Standing, moved her greatly. "I was so happy that I started a new year while listening to her powerful message because it encouraged everyone to be relentless during the bad times in their lives." She states that Ms. John is a kind hearted person and is always willing to serve others. She called Ms. John a "huge inspiration in her life" from the time that as a sophomore in high school when Ms. John taught a workshop on preventing sexually transmitted diseases to young girls. She states that over time she has been a "friend, a mother and a role model."

Eleze David, of the Endtime Harvest Outreach International Ministry is a friend of Ms. John's for the last sixteen years. She has traveled throughout the United States, Canada and Europe as ministers of the God. She calls Ms. John as positive influence to everyone she comes into contact with. She calls her "a woman of integrity and faith" (Exhibit Y).

### 5. Volunteerism

After Ms. John lost her job due to the charges against her, she volunteered at the Amethyst Women's Project. Aida Leon reported that Ms. John spent many hours conducting research to identify alternate funding sources for the organization and worked with the staff to proving AIDS/HIV training. She volunteered for more than a year. Ms. Leon stated "her faith, hope and optimism never ceased to amaze me" (Exhibit M).

Reverend Terry Lee of Community Concern Network also wrote concerning Ms. John's volunteerism (Exhibit Z). Reverend Lee stated that Marilyn John has been a "great mentor, friend, sister, and community partner." She has been involved in various initiatives for immigrants. In particular, Reverend Lee

singled out the White House Prayer initiative, where faith based
leaders come together from around the nation to pray for our
leaders, the government and their families. Ms. John volunteers
her time as a consultant and advisor for the initiative. Under
her leadership, it has grown over the years. She has
represented the initiative at meetings with elected leaders as
well as other persons and entities. Ms. John herself was
honored for her role in the Brooklyn Community for her work as a
great leader. Reverend Lee states that "in spite of her plight,
she continues to volunteer her time and services to the
Community Concern Network."

### 6.  Other Awards, Certificates, Commendations And Letters

Attached to this presentation as Exhibit AA, is a
packet of a more than ten year historical record of invitations,
thank you notes, and Certificates of Merit and Appreciation.
They range from African and Caribbean nations to national
officers and groups as well as local officials in Brooklyn.
They include program notes, speaking invitations and
commendations from Center for Disease Control. All of these
items are singular testimony of Ms. John's unique public role in
the effort to stop the spread of HIV/AIDS. These certificates
also represent her educational training from her Bachelor of
Arts, her Masters, as well as further educational training that
she underwent to make her into the prominent health educator
that she has become.

### F.  THE LOSS SCALE IS WITHOUT EMPIRICAL BASIS AND NEED NOT BE FOLLOWED

Even if the loss is properly calculated the Guideline
loss amount is still unreasonable high, leading to an
unreasonable sentence based upon Guidelines that are not
empirically based or created. This measurement of loss is
defective. With the 2B1.1 scale of 2 point raises at random
economic levels, it is not based upon any empirical data and may
be rejected by this Court as a measurement for culpability as a
matter of disagreement with the policy. Courts have
increasingly imposed non-government sponsored below range
guideline variances in fraud cases based upon policy
disagreements with the loss table requirements, especially in

Honorable Alvin K. Hellerstein
February 16, 2012
Page 28 of 52

light of Kimbrough v. United States, 552 U.S. 85, 101 (2007).
See, e.g., Parris, Id., 573 F. Supp. 2d at 745 (imposing a term
of five years where the guidelines range suggested thirty years
to life, and explicitly criticizing the economic crimes
guideline); United States v. Adelson, 441 F.Supp.2d at 506
(S.D.N.Y. 2006) (finding a guidelines sentence in a securities
fraud case so outrageous that the judge had to rely on other
factors), aff'd 301 Fed. Appx. 93 (2d Cir 2008); United States v.
Mueffelman, 400 F.Supp.2d 368, 377-78 (D. Mass. 2005) (arguing
that total loss should be a contingent factor, not absolute);
see also United States v. Emmenegger, 329 F.Supp.2d 416, 428
(S.D.N.Y. 2004) (weighing factors outside of the guidelines
calculations during sentencing in a securities fraud case); See
also United States v. Parris, 573 F.Supp.2d 744, 754 (E.D.N.Y.
2008).

        The objection to the use of the "loss" guideline in
setting a sentence is predicated upon the fact that the
Guideline itself is without any empirical basis and thus, is not
properly controlling even after Booker, 543 U.S. 220 (2005).
This becomes crucial in a case such as this where the "loss
amount" drives the Guideline sentence. The Guidelines
consistently recommend sentences that are generally too severe
in the area of fraud convictions because they place
disproportionate weight on "loss amounts" attributable to the
defendant. Additionally, the method of calculating loss in the
PSR is not even a measurement of loss that is keyed to
culpability but goes beyond general issues in sentencing to be a
measure more properly seen as greater than necessary or even
vindictive. Finally, the loss measurement is designed not to
properly punish but to respond to Congressional directives to
the Sentencing Commission that are not binding upon a court
charged with crafting a sentence under 18 U.S.C. § 3553(a). The
addition of 18 levels to the offense represents a quantum jump
in punishment range. The 2B1.1 structure in this case causes a
staggering increase in the sentence range driven solely by a
single variable that is itself concededly not an accurate
measurement or even a measurement at all.

Honorable Alvin K. Hellerstein
February 16, 2012
Page 29 of 52

1.   **The History Demonstrates A Lack Of Empirical
      Basis For The 2B1.1 Scale**

The fraud guideline which embodies the purported economic scale of U.S.S.G. § 2B1.1 places an inordinate emphasis upon what it characterizes as loss. The scale is not actually loss but merely a measurement denominated as "loss". In reality it is an artificial structure repeatedly inflated leading to sentences that reflect anything but the requirements of 18 U.S.C. § 3553, which holds itself out as an all purpose proxy for culpability.

The loss scale has been the basis for variances in sentences of defendants on the basis of appropriate policy disagreements with the U.S.S.G. § 2B1.1 scale and its consequences in the escalation of sentences. The 2B1.1 scale drives the sentence of Ms. John up an additional 18 levels above the base level of 7. It is not based upon past practice or empirical data. U.S.S.G. § 2B1.1, in this case easily produces a sentence greater than necessary to satisfy sentencing purposes, because it places undue weight on the amount of loss involved in the fraud, which in many cases is a kind of accident and thus a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

The Commission has not explained why it is appropriate to accord such huge weight to loss. See e.g. United States v. Emmenegger, 329 F.Supp.2d 416, 427-28 (S.D.N.Y. 2004). See also United States v. Adelson, supra. In Adelson, Judge Rakoff provided an incisive analysis of how the fraud guideline can lead to pointlessly barbaric results, and reduces a life sentence to 42 months based on the purposes of sentencing and individualized factors the guidelines reject.

The initial Commission increased sentences for economic crimes above past practice to provide a "short but definite period of confinement for a larger proportion of these 'white collar' cases" in the belief that this would "ensure proportionate punishment and . . . achieve deterrence." Fifteen Year Report at 56. When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure that white collar offenders faced "short but definite period[s] of confinement." U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal

Honorable Alvin K. Hellerstein
February 16, 2012
Page 30 of 52

Criminal Justice System is Achieving the Goals of Sentencing
Reform, at 56 (Nov. 2004) [hereinafter Fifteen Year Report].
The Commission in the context of mandatory Guideline scheme all
but eliminated any sentence except one of incarceration, thereby
reduced the availability of probation and adopted a fraud
guideline that subjected a defendant to no more than 78 months
in prison.  To justify the increase in the rate of confinement
above pre-guidelines practice, the Commission explained that
"the definite prospect of prison, though the term is short, will
act as a significant deterrent to many of these crimes,
particularly when compared with the status quo where probation,
not prison, is the norm." U.S.S.G., ch. 1, intro., pt. 4(d)
(1987).  Before the Guidelines nearly 50% of federal defendants
in all categories were sentenced to probation, afterwards it was
only 15%.  See United States v. Germosen, 473 F.Supp.2d 221, 227
ftnote 11 (D Mass. 2007).

        A deterrence researcher advised the Commission that
certainty is more important to deterrence than severity.  Other
research has shown that lengthy terms of incarceration have
little deterrent effect on white-collar offenders, presumably
the most rational group of offenders.  See Sally S. Simpson,
Corporate Crime, Law, and Social Control 6, 9, 35 (Cambridge
University Press) (2002); David Weisburd et al., Specific
Deterrence in a Sample of Offenders Convicted of White-Collar
Crimes, 33 Criminology 587 (1995).

        Early on, however, the Commission began to ratchet up
the punishment for economic crimes in response to pressure from
DOJ and perceived signals from Congress.  Fifteen Year Report at
56.  Since 1987, the Commission has steadily increasing prison
terms for fraud and thus increasing prison terms for all other
crimes scaled to the same monetary designation without regard to
the nature of harm or loss.  The Commission has adopted this
radical shift in sentencing policy without the support of any
empirical data demonstrating the penological value of its
substantial increases in sentence severity.  See United States
v. Adelson, 441 F.Supp.2d at 514 (citing Kate Stith & Jose A.
Cabranes, Fear of Judging: Sentencing Guidelines in the Federal
Courts 69 (1998)) ("[Be]cause of their arithmetic approach and
also in an effort to appear 'objective,' [the Guidelines] tend
to place great weight on putatively measurable quantities, such
. . . [the] amount of financial loss in fraud cases, without,

Honorable Alvin K. Hellerstein
February 16, 2012
Page 31 of 52

however, explaining why it is appropriate to accord such huge weight to such factors.

From 1987 to 1995, the Commission increased the punishment for economic crimes nearly annually, resulting in an "unplanned upward drift." *See* Frank O. Bowman III, *Pour Encourager Les Autres?* 1 Ohio State J. Crim. L. 373, 387 (2004). Application Notes such as the one applied to government benefits also were promulgated so as to drive the loss amount out of the range of actual loss into punitive levels that then were claimed to be a rough proxy for culpability.

In 1989, former Commissioner Michael K. Block and former Deputy Chief Counsel Jeffrey S. Parker criticized the Commission for "gratuitously" increasing punishment for larger fraud cases by as much as 25% in response to the DOJ ex officio's argument that certain statutes were "oblique signals" from Congress when the statutes "said no such thing." Block and Parker noted that the process was "overtly political and inexpert," and that the Commission had abandoned its statutory mandates by failing to rely on its own data, failing to measure the effectiveness or efficiency of guideline sentences, and failing to provide analysis of prison impact. *See* Jeffrey S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289, 318-20 (1989). From 1987 to 1995, the Commission increased the punishment for economic crimes nearly annually, resulting in an "unplanned upward drift." *See* Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 387 (2004).

In the Economic Crimes Package of 2001, it lowered sentences for some low-loss offenders but significantly raised sentences for most mid to high-loss offenders. In 2003, the base offense level was increased from six to seven for defendants convicted of an offense with a statutory maximum of 20 years, i.e., any type of fraud after the Sarbanes-Oxley Act, resulting in a 10% increase for all fraud offenders, and restricting or precluding non prison alternatives for the 40% of fraud offenders at the lowest level. This followed intense pressure from DOJ and a unilateral amendment of the legislative history by one Senator directing the Commission to determine whether enhanced penalties were warranted not only for the high-end, big-dollar corporate scandals at which Sarbanes-Oxley was

directed, but for low-level fraud offenders, after "closely considering" the "penalty gap" between fraud and narcotics cases. Id. at 387-435. However, sentences for low-level drug offenders are overly severe and therefore provided no basis for increasing the punishment for low-level fraud offenders.

Because the Commission failed to cite empirical data, and thus failed to fulfill its institutional role, sentencing courts have tremendous discretion to disagree, on policy grounds, with § 2B1.1's recommendations. See Spears v. United States, 129 S.Ct. at 843 (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). When the Sentencing Commission fails to fulfill "its characteristic institutional role" of developing a particular guideline, or its later amendments, based upon empirical data, national experience, or some rational policy basis, the district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." United States v. Kimbrough, 552 U.S. 85 (2007). Similarly, when the Commission acknowledges problems with a particular guideline but fails to make appropriate modifications, a sentencing court has greater latitude to sentence outside the advisory range. Id. (upholding below-guidelines sentence based on policy disagreement with crack/powder disparity where Commission itself had reported that the disparity produced disproportionately harsh sanctions). The Sentencing Commission has dramatically increased sentences for fraud over the past 20 years. These steady increases have been adopted without empirical support.

With no empirical basis for the application of fundamentally escalated fraud guideline amounts to the crime in this case, the calculation should be accorded little weight and the sentence should be less than that dictated by U.S.S.G. § 2B1.1. A non-Guideline sentence is appropriate. The Commission has failed to fulfill its institutional role of considering empirical evidence when making the amount of loss central to its fraud guideline, and then repeatedly increasing the amount of points imposed for specific loss amounts. The resulting fraud guideline is, therefore, entitled to no deference. This Court

Honorable Alvin K. Hellerstein
February 16, 2012
Page 33 of 52

should look to the all of the § 3553(a) factors, and the
empirical data not considered by the Commission, in fashioning a
sentence "sufficient, but not greater than necessary" to fulfill
the various purposes of sentencing.

###         2.    The Basis For Variance As To The Loss Amounts

          Where the Guideline in question is not based on
empirical data and national history of other sentences, the
issuance of that sort of Guideline "does not exemplify the
Commission's exercise of its characteristic institutional role."
Kimbrough, Id.   The U.S.S.G. § 2B1.1 scale is a Guideline not
based on empirical data and national history.   The defense seeks
a non-Guideline sentence because the use of U.S.S.G. § 2B1.1
scale in PSR paragraph 4 A 2c is not a proper basis for a
sentence in this matter because the Guideline produces a
sentence that is greater than necessary to satisfy sentencing
purposes.   It places undue weight on the amount of loss involved
in the fraud, which in many cases "is a kind of accident" and
thus a relatively weak indicator of the moral seriousness of the
offense or the need for deterrence.   Where the Guideline in
question is not based on empirical data and national history,
that sort of Guideline "do[es] not exemplify the Commission's
exercise of its characteristic institutional role."   Thus, "a
district court may find that even after giving weight to the
[factors that drive the enhancement or reduction] there is
[still] a wide variety of culpability amongst defendants and, as
a result, impose different sentences based on the factors
identified in § 3553(a)." Id.

          The Commission has yet to explain why it is
appropriate to accord such huge weight to loss.   See United
States v. Emmenegger, 329 F.Supp.2d 416, 427-28 (S.D.N.Y. 2004).
See also Adelson, supra.   In Adelson, Judge Rakoff provided an
incisive analysis of how the fraud guideline can lead to
pointlessly barbaric results, and thus a rationale for a
variance.   He reduced a Guideline set life sentence to 42 months
based on the purposes of sentencing and individualized factors
that the Guidelines otherwise have rejected.   Noting the
historical basis for white collar sentences that sought an end
to probation as a default sentence and the creation of a
standard of a "short but definite period of confinement for a
larger proportion of these 'white collar' cases" would "ensure

Honorable Alvin K. Hellerstein
February 16, 2012
Page 34 of 52

proportionate punishment and achieve deterrence." Judge Rakoff
cited the Commission's own Fifteen Year Report at 56.    Judge
Rakoff noted also that a deterrence researcher advised the
Commission that certainty is more important to deterrence than
severity.   White-collar  offenders  are  presumably  the  most
rational group of offenders.

         Instead,   the   Commission   since   1987   has   steadily
increasing prison terms for fraud without regard to the nature
of harm or loss.  It is a radical shift in sentencing policy
without  the  support  of  any  empirical  data  demonstrating  the
penological  value  of  its  substantial  increases  in  sentence
severity.   See Kate Stith & Jose A. Cabranes, *Fear of Judging:
Sentencing Guidelines in the Federal Courts* 69 (1998) ("[Be]
cause  of  their  arithmetic  approach  and  also  in  an  effort  to
appear  'objective,'  [the  Guidelines]  tend  to  place  great  weight
on  putatively  measurable  quantities,  such  …  [the]  amount  of
financial  loss  in  fraud  cases,  without,  however,  explaining  why
it is appropriate to accord such huge weight to such factors.")

         Further the empirical evidence was available but the
Commission  has  failed  to  fulfill  its  institutional  role  of
considering empirical evidence when making the amount of loss
central to its fraud guideline, and then repeatedly increasing
the amount of offense levels imposed for specific loss amounts.
Because the Commission failed to cite empirical data, and thus
failed to fulfill its institutional role, sentencing courts have
tremendous  discretion  to  disagree,  on  policy  grounds,  with  §
2B1.1's  recommendations.   See Spears v. United States, supra.,
(explaining  that  when  the  Commission  fails  to  fulfill  its
institutional  role,  a  district  court  can  vary  from  the
guidelines "based on policy disagreement with them, and not
simply based on an individualized determination that they yield
an  excessive  sentence  in  a  particular  case").   When  the
Sentencing  Commission  fails  to  fulfill  "its  characteristic
institutional role" of developing a particular guideline, or its
later   amendments,   based   upon   empirical   data,   national
experience, or some rational policy basis, the district court
has the discretion to conclude that the resulting advisory range
"yields  a  sentence  'greater  than  necessary'  to  achieve  §
3553(a)'s purposes, even in a mine-run case."  Kimbrough.  The
resulting  fraud  guideline  is,  therefore,  entitled  to  no
deference.   This Court should look to the all of the § 3553(a)

Honorable Alvin K. Hellerstein
February 16, 2012
Page 35 of 52

factors, and the empirical data not considered by the
Commission, in fashioning a sentence "sufficient, but not
greater than necessary" to fulfill the various purposes of
sentencing. Even the Department of Justice has acknowledged
cases in which loss greatly exceeds a defendant's gain are
likely candidates for below-guidelines variances. See Hearing
on Proposed Amendments to the Sentencing Guidelines Before the
U.S. Sentencing Commission, 112th Cong. 2, 4 (2011) (statement
of Preet Bharara, United States Attorney, SDNY), available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearin
gs_and_Meetings/. 20110216/Testimony_DOJ_%20Bharara.pdf.

     The advisory guideline range in this case scored on
the basis of U.S.S.G. § 2B1.1 is far greater than necessary to
satisfy the goals of sentencing. Because there is no empirical
basis for the application of fundamentally escalated fraud
guideline amounts to the crime in this case, the § 2B1.1
calculation should be accorded little weight and the sentence
should be less than that dictated by U.S.S.G. § 2B1.1, and
therefore a non-Guideline sentence is order.

     Defendants are often treated the same under the
economic crimes guideline even though the purposes of punishment
call for different treatment. Another name for this is
unwarranted uniformity. The loss table fails to differentiate
offenders who ought to be differentiated. For example, an
amount of loss—especially when it is actual loss—does not tell
us anything about why the defendant committed the offense or how
much he personally benefited. These motive-based facts are
important for issues of retribution, deterrence, and the need
for incapacitation under 3553(a) determinations.

### 3.    Collateral Consequences

     In determining the sentence of Ms. John, the Court may
and should consider the impact upon her of this conviction and
public humiliation. She now has a criminal record, a felony
record. As a result, it will affect every government or private
application she makes, every loan she applies for, every
government benefit she tries to obtain. Very often one pleads
for a client by saying that she has suffered enough. It may be
that Ms. John has suffered enough. In this day and age, she has
gone from being the Executive Director of a public health
organization based upon her actual qualifications, including a

Master's Degree in Public Health, to being a DOI press release
touting success against corruption discoverable by no more than
an Internet search of her name.

The Court may consider, as the Supreme Court stated in
Koon v. United States, 518 U.S. 81, 110 (1996), the collateral
consequences of the conviction on Ms. John's career.  In Koon,
the Court stated that it is not unusual for a public official to
lose his or her job on the basis of a violation of law and
therefore, was not a proper basis for a departure not being
outside the heartland.  But in the post-Koon world, after Gall
and Kimbrough, it is clear that a court may consider the impact
and collateral consequences, and appropriately hand down a non-
Guideline sentence.

Collateral consequences to Ms. John include the loss
of employment, the clear restrictions that a federal felony
places upon her future employment viability and utility as a
public health educator.  A sentence should take into account
other punishments which includes the fact that her participation
in the mortgage fraud did fatal damage to her credit.  All of
these variables are available for the Court's consideration for
mitigation under 18 U.S.C. § 3553 (a).  There is more to the
concept of just punishment and deterrence of an individual than
just the temporal and physical hardships and restraints of a
sentence of the Court.  There is the deprivation of liberty by
incarceration  in  a  prison,  there  is  deprivation  from
incarceration in one's home or under supervision, all of which
impose unwilling restrictions upon ordinary freedom of movement
which all take for granted.  A host of other penalties and
burdens always attend criminal convictions which include loss of
socioeconomic status, public esteem, public employment, career
opportunities, diminution of civil rights and entitlements as
well as countless humiliations and indignities associated with
public opprobrium.  Just punishment requires assessment of these
elements as well.  See United States v. Mateo, 299 F.Supp.2d 201
(S.D.N.Y. 2004).

Every person convicted of a federal felony faces
certain penalties.  For Ms. John, whose area of expertise is
public health faces debarment and exclusion from employment by
or participation in employment in her field.  The Secretary of
Health and Human Services must exclude persons or entities
convicted of an offense relating to the delivery of an item or

service under the Medicare program or any state health care program.  42 U.S.C. § 1320a-7(a)(1), (a)(2).

In addition, for offenses occurring after August 21, 1996, the Secretary must exclude persons or entities convicted of a felony offense in connection with the delivery of a health care item or service or with respect to any act or omission in a health care program (other than an offense already covered by mandatory exclusion) that consists of fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct.  42 U.S.C. § 1320a-7(a)(3).

Conviction may result in debarment from participation in a federal contract or program.  See 48 C.F.R. Part 9, Subpart 9.4. Under Executive Order No. 12,689, debarment, suspension, or exclusion of a participant in a procurement or non-procurement program has government wide effect.  The period of debarment is generally not to exceed three years.  5 C.F.R. 970.320.

The Court in United States v. Virgil, 476 F.Supp.2d 1231, 1235 (D.N.M. 2007) found that a variance from a guideline sentence was appropriate where a defendant in a public corruption case was already collaterally punished by the loss of their position, the loss of reputation, widespread media coverage of their case. Such impediments as to both the punitiveness and the deterrent effect of her felony conviction in a manner not faced by another defendant who did not work in this field or related fields.  See United States v. Jagemann, 2007 WL 2325926 (E.D. Wisc. 2007).  The Court may also consider the fact that Ms. John has lost a good public sector job with the City Department of Health which intensifies the punitiveness of the conviction.  See United States v. Scott, 503 F.Supp.2d 1097 (E.D. Wisc. 2007); United States v. Samaras, 390 F.Supp.2d 805 (E.D. Wisc. 2005).  See also United States v. Gaind, 829 F.Supp. 669 (S.D.N.Y. 1993) [destruction of business an impact upon others]:

> Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual

Honorable Alvin K. Hellerstein
February 16, 2012
Page 38 of 52

and general deterrence. Others engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior.

Ms. John's prosecution has served the same purpose. Her ability to engage in similar or related activities have decreased for the foreseeable future the ability to commit further crimes. She cannot secure another public sector job with her felony conviction and is without credit to serve as a straw buyer. She has lost her public positions and status in the community. She has been and is substantially incapacitated from committing any crimes by the loss of public office, and personal respect. The negative publicity, the loss of her job in the City, as well as public respect, will provide adequate deterrence against future criminal conduct. As she stands before the Court today, Marilyn John is incapacitated as to committing another crime.

### G. MATTERS IGNORED BY THE GUIDELINES DESPITE COMMISSION RESEARCH: RECIDIVISM DECLINES WITH AGE

Both the age of the offender and the fact that the offender at that particular age has committed her first offense are powerful predictors of the likelihood of further criminal behavior or recidivism. In the case of Ms. John, her age and lack of prior criminal behavior are powerful evidence that there will not be any likelihood of further criminal behavior by Ms. John.

Ms. John seeks a non-Guidelines sentence on the basis that the Commission has failed to reflect issues regarding the impact of age and absolute absence of prior criminal behavior as there is no need to fear that society needs protection from her due to her age and especially low risk of recidivism, which is a basis for a non incarcerative sentence. Ms. John is no danger to the community in terms of commission of another criminal act.

Society needs not to be protected from this defendant. The public disgrace means that there is no place to hide and given her age and other demographics. Her risk for recidivism is non-existent such that incarceration is a greater than necessary response to the criminal acts for which she is to be

sentenced.  In the area of age and demographics of recidivism
the Sentencing Commission has done extensive work and research
collecting data that it nowhere applies to the Guidelines
process and as such are a basis for a non-Guideline sentence
based upon the Commission's abdication of actions that would
cause sentences to be lowered.

        The Supreme Court has recognized that the Guidelines
do not treat certain characteristics in the proper way.  Both
Rita and Kimbrough state that certain guideline matters fail to
take into account empirical data or directly contradict the
data.  One area where the Guidelines defy all penological
research and wisdom is age.  The Guidelines hold fast to the
notion that age is not relevant.  Therefore, an offender of Ms.
John's age, at almost 54 years old is sentenced within the same
range as that of a twenty year old, which commits the same
crimes and has the same record of offense.  Empirical data
demonstrates that Ms. John's likelihood of re-offense is
miniscule compared to the twenty year old.  When they are
treated identically, the Guideline range when applied to Ms.
John is at a range greater than necessary to meet the purposes
of 3553(a), including the protection of the public under 3553(a)
(2) (c).

        For a 53 year old, first time offender, the severity
of prison is greater for her.  It is unnecessary for the
protection of the public and to prevent reoccurrence by the
offender.  A prison term would mean more in terms of the effect
of punishment to Ms. John than to a defendant who had previously
been imprisoned.  See United States v. Baker, 445 F.3d 987, 992
(7th Cir. 2006) (non-jail sentence for first time offender).
Evidence of age is significant.  See United States v. Hernandez,
604 F.3d 48 (2d Cir. 2010) (remanded for failure to consider
offender's age).  In United States v. Carter, 538 F.3d 784 (7th
Cir. 2008 ) a sentence was dropped from a range of 87-108 months
to 24 months because, in part, the age of the defendant, 61
years old made her a low risk of recidivism.  Occupation and
education play a role in demonstrating a low risk of re-offense.
Where a defendant loses her life's work after achieving a
Masters in Science especially in Public Health, the conviction
makes it nearly impossible or extremely improbable that she will
ever be in a position to re-offend.  See United States v.
Stewart, 590 F.3d 93, 135-136 (2d Cir. 2009) (translator will

Honorable Alvin K. Hellerstein
February 16, 2012
Page 40 of 52

never find work again). <u>See</u> <u>also</u> <u>United States v. Edwards</u>, 595
F.3d 1004 (9th Cir. 2010) affirming a probation sentence with
seven months of house arrest down from a range of 27-33 months
based on the court's belief that he will not re-offend.

Even the Sentencing Commission has recognized that
recidivism rates decline dramatically with age and first time
offenders are even less likely to re-offend than defendants with
even limited criminal histories who score in Category I Criminal
History Category. <u>See</u> U.S. Sentencing Commission; Measuring
Recidivism: The Criminal History Computation of the Federal
Sentencing Guidelines (May 2004) p 13-14 (hereinafter "First
Offender Report"). Commission research has demonstrated that
offenders with zero criminal history points have a recidivism
rate of 11.7%. For offenders over the age of 50, the rate of
recidivism drops to 9.5%.

Despite the empirical evidence the Commission has
failed to address the issue in terms of Guideline revision. In
the First Offender Report, the Commission identifies a goal of
refining a workable first offender concept within the Criminal
History Category structure but has not done so. The Commission
also recognizes that by taking into account age, it would
improve the predictive power of the Guidelines. In the five
years since the appearance of the Fifteen Year Report, nothing
has been done. Congress directed the Sentencing Commission to
insure that the Guidelines reflect the general appropriateness
of imposing a sentence, other than imprisonment, in cases in
which the defendant is a first offender who has not been
convicted of a crime of violence or an otherwise "serious"
offense. 28 U.S.C. § 994(j). Instead of following the
directive, the Commission redefined "serious offense" so as to
prevent the lowering of sentences. The definition was
inconsistent with the prior practice upon which Congress relied
and not at all based upon real data or analysis so as to
increase the incarceration rate for non-violent first offenders
above the pre-Guidelines range. <u>See</u> <u>United States v. Germosen,</u>
473 F.Supp.2d 221, 227 (D. Mass. 2007).

Again, courts have responded to challenge by taking
into account the age of the offender, and the fact that the
offense is a first time offense, reflecting application of 18
U.S.C. § 3553(a). This Circuit has stated that it can be an
abuse of discretion for a court not to take into account policy

Honorable Alvin K. Hellerstein
February 16, 2012
Page 41 of 52

considerations with regard to age related predictions as to recidivism not included in the Guidelines. <u>United States v. Hamilton</u>, 323 Fed. Appx. 28; 2009 WL 995576 (2d Cir. 2009). <u>See also United States v. Ward</u>, 814 F.Supp. 23, 24 (ED Va. 1993) which set out as a basis for a lower sentence the fact that the Guidelines do not take into account the length of time a particular defendant refrains from criminal conduct.

Given Ms. John's age, education, and the fact that she has not committed a crime before, every predicative element demonstrates that she is extremely unlikely to recidivate. Her time under Pre Trial Supervision demonstrates the compliant nature of the woman and her remorse driven willingness to do everything possible to comply with the law, the rules and requirements. Given her age and her lack of prior contact with the criminal justice system, the sentence recommended by Probation of 51 months is greater than necessary to protect the public from Ms. John.

**A.   Levels of Education Reduce Recidivism : Capacity to Learn the Lesson of Deterrence**

Recidivism rates also decrease as educational levels increase.  For Ms. John, who has a Master's Degree and many other similar educational achievements, her rate of recidivism plotted on a matrix would be minute. Another element in the low risk of recidivism is the fact that due to the loss of her public positions, she will never again be able to commit the embezzlement crimes she committed in this case.   In the fashioning of a sentence that deters, it is relevant to consider whether the defendant will be able to commit future crimes like the one for which he is being prosecuted.

**B.   Other Factors Required To Be Considered**

The nine Guideline factors listed in 18 U.S.C. § 3553 (a) coupled with the parsimony clause suggest a more appropriate and individualized sentence for Ms. John.   A defendant's reasonable sentence, under Booker's remedial scheme, imposes a duty to impose "a sentence sufficient, but not greater than necessary, to comply with sentencing purposes."  The parsimony clause is the moral counter weight to punishment for the sake of punishment. It calls into question the Guideline severity and seeks to ameliorate it.

Honorable Alvin K. Hellerstein
February 16, 2012
Page 42 of 52

Title 18 U.S.C. § 3553 (a) provides that the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The "purposes set forth in paragraph (2)" are the need for the sentence to: reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other treatment in the most effective manner. The Court may also look at the sentences of other defendants in the same case.

### 1.   Co-Defendant's Sentences

Mr. Powell, apparently the ringleader and the person who profited the most from the fraud, received a sentence of 48 months. Mr. Vaughan Richmond received a sentence of a year and a day. Both received three years supervised release. Probation recommends a sentence of 51 months for Ms. John, a straw buyer in the mortgage scheme and having engaged in embezzlement from her place of employment.

### 2.   The Seriousness Of The Offense And Respect For Law

There is no doubt that the offenses committed by Ms. John are serious. Respect for law and the appreciation of a punishment calibrated to the seriousness of the offense travel hand in hand. However, in order to demonstrate the seriousness of the offense or respect for law, the imposition of a jail sentence is not the sole method for expressing social values of disapproval for criminal behavior. Restriction upon freedom constitutes punishment. In light of the application by the Government in this matter, it appears that the Court can hand down a non-incarcerative sentence and yet still demonstrate the seriousness of the offense and the respect for law.

### 3.   Adequate Deterrence

In considering the 3553(a) issues, prosecutors and courts often focus properly upon the need for general deterrence, as embodied in 3553(a) (2) (a) and (b). In the discussion of general deterrence in this case certain things leap out.

Honorable Alvin K. Hellerstein
February 16, 2012
Page 43 of 52

The first is the institutional fact that empirical research on the issue fails to demonstrate that sentencing to incarceration of white collar felons actually creates or serves the goal of general deterrence. At the time of the original Guidelines empirical research showed that certainty of punishment rather than the length of punishment had the greatest deterrence. Researchers at the time found no difference in deterrence even between probation and imprisonment for white collar offenders. See Weisburd, et al, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes* 33 Criminology 587 (1995) ("There is generally no significant association between perception of punishment levels and actual levels… implying that increases in punishment levels do not merely routinely reduce crime through deterrence mechanisms.)

However, in the twenty or so years since the Guidelines came into force, empirical research has shown that certainty continues to have a deterrent effect, severity does not significant if any marginal deterrent effects See Tonry, *Purposes and Functions of Sentencing* 34 Crim. & Just. 1, 28 92006). Three national Academy of Science panels reached that conclusion as has every major survey of the evidence. Id. See also Gabbay, *Exploring the Limits of Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-448 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity"). Findings at the Institute of Criminology at Cambridge University, commissioned by the British Home Office and done by the noted criminologist Andrew von Hirsch, examined penalties in the United States as well as European nations in order to weigh the effect of changes in both the severity and the certainty of punishment. It found that correlations between severity and crime rates were not sufficient to achieve statistical significance. The report concluded that the studies reviewed "do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects. In contrast significant correlations were found between the certainty of punishment and crime rates. See also Gabbay, *Exploring the Limits of Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-449 (2007. Significantly, the Commission has not in the last twenty years of increasing severity of punishment offered any empirical data to rebut the

Honorable Alvin K. Hellerstein
February 16, 2012
Page 44 of 52

contemporary consensus in the social science community disputing
deterrent values of increased sentences.

Apart from the social science rationale's absence to
support the severity of sentences creates general deterrence is
the fact that general deterrence is more pitched to some crimes
than others and found in different methodologies.   For example
in the case of drug or violent crimes, length of punishment
serves as a general deterrent as well as an immediate protection
of the community.    In the case of white collar crimes such in
this case, general deterrence is tied directly to the quantum of
public shame occasioned by the particular offender being held up
to the community as an offender and as a representative of her
class or her occupation.

Respect for the law is promoted by punishments that
are fair, however, not those that simply punish for punishment's
sake.   United States v. Cernik, No. 07-20215, 2008 U.S. Dist.
LEXIS 56462, at *25 (E.D. Mich. July 25, 2008) ("[A] sentence of
imprisonment may work to promote not respect, but derision, of
the law if the law is viewed as merely a means to dispense harsh
punishment without taking into account the real conduct and
circumstances involved in sentencing." (citing Gall, 128 S.Ct.
at 599)).   There is no reason to believe that respect for the
law will increase if a defendant who deserves leniency is
sentenced harshly any more than there is reason to believe that
respect for the law will increase if a defendant who deserves a
harsh punishment receives a slap on the wrist.

Given that it is clearly certainty of punishment not
severity, it is unnecessary to provide general deterrence or
specific deterrence to Ms. John and others by jailing her.    In
the Sentencing Reform Act Congress directed the Sentencing
Commission to insure that the Guidelines reflect the general
appropriateness of imposing a sentence other than imprisonment
in cases in which the defendant is a first offender who has not
been convicted of a crime of violence or an otherwise "serious"
offense. 28 U.S.C. § 994(j). The Commission's response was to
redefine "serious offense" in a way that was inconsistent with
the prior practice upon which Congress relied and not at all
based upon real data or analysis so as to increase the
incarceration rate for non-violent first offenders above the pre
Guidelines range.   See United States v. Germosen, 473 F.Supp.2d
221, 227 (D Mass. 2007).

Honorable Alvin K. Hellerstein
February 16, 2012
Page 45 of 52

### 4.    The Parsimony Clause

The duty to impose a sentence sufficient, but not greater than necessary, to comply with sentencing purposes, is a finely nuanced discrimination and determination about which little useful guidance has been provided.  In United States v. Ministro-Tapia, 470 F.3d 137 (2d Cir. 2006), the Second Circuit found that "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of 3553 (a), it could not, consistent with the parsimony clause, impose the higher."  Conceptually, at least, Ministro-Tapia may be read as a directive to sentencing courts in the Second Circuit to impose the shortest sentence necessary to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a).

But this remains of little practical use.

The parsimony concept in penal theory and the philosophy of punishment is a concept of distribution of punishment so as not to maximize pain.  It is a principle that mandates the taking of care when punishment is distributed to avoid excesses in punishment.  Jeremy Bentham articulated a "parsimony principle" which stated that any punishment greater than is required to achieve its end is unjust.  It is from Bentham that our law has derived the requirements of individualized punishment which is the hallmark of parsimony. Bentham believed that true parsimony required punishment to take into consideration the sensibility of the individual and thus an individual more sensitive to punishment should be given a proportionately lesser one, in order that what would be needless pain for that individual would be avoided and yet punishment would be appropriately imposed.  While in ordinary cases, due to the impracticality of determining each alleged criminal's relative sensitivity to specific punishments, this highly nuanced determination has been abandoned, it remains in our law in such areas of forbidding of the execution of the insane for whom the punishment would have no meaning.  See Ford v. Wainwright, 477 U.S. 399 (1986).  However, the principle retains its own vitality in terms of the command for individualization of sentences.  The Supreme Court wrote in Koon the basis of sentencing under the Guidelines is fundamentally the same assessment delegated to the judiciary from the very first moment

Honorable Alvin K. Hellerstein
February 16, 2012
Page 46 of 52

man moved from mob justice inside into rooms with the signs and
symbols of rationality:

> This too must be remembered, however. It has been
> uniform and constant in the federal judicial tradition
> for the sentencing judge to consider every convicted
> person as an individual and every case as a unique
> study in human failings that sometimes mitigate,
> sometimes magnify, the crime and the punishment to
> ensue. We do not understand it to have been the
> Congressional purpose to withdraw all sentencing
> discretion from the United States District Judge.
> Discretion is reserved with in the Sentencing
> Guidelines and reflected by the standards of appellate
> review adopt[ed]. Koon, Id.

In a day when, as United Supreme Court Justice Anthony
Kennedy put it, "our resources are misspent, our punishments too
severe, our sentences too long," the idea of a sentence that is
no longer than necessary is a remarkable consideration.

In the case of Ms. John, the parsimony clause plays a
more focused role. It is a means of ameliorating the
inflexibility of the starting point of a sentence keyed to the
amount of gross loss. Parsimony suggests that a sentencing
court consider what degree of punishment is necessary. A non-
Guidelines sentence is sufficient to satisfy the purposes of
punishment. Courts may impose such sentences consistent with
Ministro-Tapia, but need not do so. As demonstrated by the
instant presentation, this sentencing court may properly use the
parsimony clause as well as other considerations to provide this
defendant with a non-Guideline sentence.

## MS. JOHN'S FUTURE

The future for Ms. John is the hands of the Court. It
is as bleak as could be for a person to whom a single day in
jail is terrifying all by itself. She is without a means at
present to earn a livelihood.

Should she be jailed beyond a split sentence, she is
without means to make restitution or make any other court
ordered payments. Every moment of incarceration impedes her

Honorable Alvin K. Hellerstein
February 16, 2012
Page 47 of 52

ability to address her financial condition and causes only more punitive consequences.

A jail sentence for any period of time greater than a "taste" would cause Ms. John to lie fallow, unable to help herself or others. She would be punished and at the same time, society would be deprived of any utility she could provide.

**HOW TO PUNISH MS. JOHN**

### 1. Restitution

Loss for purposes of evaluating the seriousness of a fraud under the Sentencing Guidelines and loss for purposes of restitution are, on the facts of this case, potentially quite different. The purpose of restitution "is to make the victims whole" while "the Sentencing Guidelines serve a punitive purpose. The amount of restitution is limited to the victim's actual losses. The PSR seeks over $2 million in restitution without any determination as to whether the bank victims actually have or have not recouped monies on the basis of the properties securing the notes, and without regard to the fact that the banks currently are in position to own those properties.

### 2. Split Sentence

By statute Ms. John is not eligible for probation because the instant offense is a B felony for which probation has been expressly precluded by statute, pursuant to 18 U.S.C. § 3561(a). However, a sentence can be satisfied by a split sentence, a short period of time of incarceration such as a jail sentence of a day and five years' probation with home confinement. Like any sentence which substantially restricts freedom, a split sentence serves the same purposes of punishment.

In the enacting of the original Sentencing Reform Act, one of Congress's chief complaints about sentencing before the guidelines was that the law was not "particularly flexible in providing the sentencing judge with a range of options," such that "a term of imprisonment may be imposed in some cases when it would not be if better alternatives were available," or a "a longer term than would ordinarily be appropriate simply because

Honorable Alvin K. Hellerstein
February 16, 2012
Page 48 of 52

there were no available alternatives that served the purposes he sought to achieve with a long sentence." S. Rep. No. 98-225, at 50 (1983). In Congress's view, there was "too much reliance on terms of imprisonment when other types of sentences would serve the purposes of sentencing equally well without the degree of restriction on liberty that results from imprisonment." Id. at 59. Congress believed that a term of imprisonment was not "necessarily a more stringent sentence than a term of probation with restrictive conditions and a heavy fine." Id. at 55. Congress believed that larger fines, probation with conditions, and alternatives to all or part of a prison term such as community service or intermittent confinement should be used more often, Id. at 50, 59, and that it would be up to the judge to determine whether the purposes of sentencing would best be served by probation or imprisonment, Id. at 92, 119, except that imprisonment was not appropriate to achieve the purpose of rehabilitation. See 18 U.S.C. § 3582(a). Congress thus authorized judges to impose probation for most offenses, i.e., any offense with a statutory maximum below 25 years unless expressly precluded for the offense, see 18 U.S.C. § 3561(a).

        In the case at bar, Ms. John's plea of guilty on Count 2 of the Information made her ineligible for probation as a matter of law as her exclusive sentence. Nothing precludes the Court for exercising its powers to issue a variance and in reliance upon the Government motion to sentence Ms. John to a split sentence. A split sentence would still be punishment. The taste of jail of incarceration would serve one powerful purpose. After the taste of jail the fear of returning to a jail cell would be a second level, more intense deterrence against any behavior other than strict compliance. As Justice Stevens wrote in Gall about probation, "[Gall] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of hers probationary term." Id. at 125.

        The suggested sentence combines both the severity of a period of custodial sentence and the severity of probation's

Honorable Alvin K. Hellerstein
February 16, 2012
Page 49 of 52

monitoring restrictive of liberty.   See United States v. Knights, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled").   Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from their probation officer or the court.   They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.   U.S.S.G. § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court, which may include restrictions on employment and activity.   "[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives.... They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions".   1 N. Cohen, *The Law of Probation and Parole* § 7:9 (2d ed. 1999).

But how does one create balance?   Each of us hears conflicting and often inarticulate inner voices; one asserting that even the most contrite and reformed sinners must still pay some price for their sins, the other calling for mercy and forgiveness and asking us to empathize with the criminal.   So it is not surprising that collectively we struggle to balance the form and amount of punishment that is appropriate, a struggle that lies at the heart of what we mean by "justice."   See Morris B. Hoffman & Timothy H. Goldsmith, *The Biological Roots of Punishment*, 1 OHIO ST. J. CRIM. LAW 627, 627, 638 (2004).

A split sentence serves a number of purposes in this case.   A taste of jail instills the appropriate shock and pain that incarceration causes.   A sentence of five years of probation is enough time for the Court to supervise Ms. John. Over the entire five years lies the constant threat of imprisonment, a far more effective deterrent that a jail sentence that can be done and finished.   In fact, for a defendant like Ms. John, the fear of jail is far more powerful a deterrent after the taste of jail.

Honorable Alvin K. Hellerstein
February 16, 2012
Page 50 of 52

A split sentence has some greater benefit to the public as well. First it leaves Ms. John in the community in which her shame and guilt remain on public display. As her son Jerell wrote to the Court "It is not easy to read negative things about my mom in the newspapers, hear it on the radio, etc." To that end it is not a benefit alone but a sentence that is serious and carries with it a public burden. She moves through her community as a bad example and a reproach to herself and others. Her charitable work would have greater resonance. Her ability to minister would also have greater meaning.

Secondly, it leaves her within the jurisdiction of the Court so that the Court can insure that restitution is paid. Supervision of Ms. John will be for her as confining as the prison sentence, given that she has except for the period Pre Trial supervision she has operated without confinement or restriction. A split sentence of some sort will likely provide a means by restitution can be accomplished.

It aids Ms. John and the community by enlisting the aid of the Probation Department in needed vocational training to meet this new and unfamiliar condition in which she is without a job, livelihood or profession. As her son pointed out, she has lost her job and is without income. Her work in public health is forever compromised by the felony conviction. Collateral consequences demonstrate that she is harmed by her conviction to a greater degree than most people.

### 3.   Home Confinement

As part of her split sentence we request that the Court consider home detention. Ms. John would be placed on five years' probation. She would be required to serve a portion of the time under home confinement. She would leave home only to work, for medical treatment, religious services or as permitted by Probation. The cost to taxpayers of home confinement costs only $115 per month. Indeed the home confinement might serve as a substitute for prison sentence or serve as a combination of a day of jail and a period of home confinement followed by a sentence of probation.

Honorable Alvin K. Hellerstein
February 16, 2012
Page 51 of 52

## A NON-GUIDELINE SENTENCE IS APPROPRIATE

Ms. John's history and characteristics consist of performing the ordinary acts of family life with courage and selflessness. Her family members and friends and neighbors described her without artifice and with great sincerity as a good and caring woman for those at home and in foreign nations. The existence of "the history and characteristics of the defendant" is a cornerstone of the sentencing factors. It means that a life well-lived counts. Evil things done register more vividly in the mind than the great mass of dull good deeds. The focus on the bad acts in this process and the emphasis upon them in punishment causes a loss of proportion. What fades into the background of a life is what should be foremost. And a criminal sentence should reflect the entirety of that life lived.

Because the Base Offense Level is ratcheted up by the scale of U.S.S.G. § 2B1.1 and punishment flows from that implacable number, a non-Guideline sentence may be considered in order to ameliorate the harshness of this number so as to allow the defendant to be sentenced to a split sentence with probation. A court faced with such Guideline computation cannot avoid sending a defendant to prison, unless it decides to hand down a non-Guideline sentence, taking into account the various factors of Title 18 U.S.C. § 3553(a). The factors of the statute permit a non-Guideline sentence.

However, as the Court is aware, the mechanical numbers of the Guidelines are not sufficient to encapsulate the varieties and vagaries of human nature which are an essential component of a sentence individualized and reasonable in this day and age. From the very first, the Sentencing Commission itself acknowledged that the Guidelines do not take into account "the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. § 1A1.1. (4)(b) (1987 ed).

## CONCLUSION

Once before there were Guidelines, there was more innate wisdom in the sentencing of individual human beings. The fight was not a measuring of pints and an assessment of levels as the base line evaluation of a human being. We saw people for their frailties and their possibilities. After Booker, we have the ability restored to us to do this work of reclaiming the

Honorable Alvin K. Hellerstein
February 16, 2012
Page 52 of 52


human self after criminal behavior.   We also have the ability
now to find a way out of the mythical heartland.   We likewise
have the opportunity to find the heart of a person, to weigh and
make judgments which are laden with authenticity and not merely
authority.

                          Respectfully yours,



                          /s/ DAVID L. LEWIS
                          DAVID L. LEWIS

DLL/bf
cc:  Justin Anderson
       Assistant United States Attorney
       Pamela Perea
       United States Probation Officer
       Marilyn White